**INTERNATIONAL SALT COMPANY**

v.

**COMMISSIONER OF PATENTS,**
**Appellant.**

**INTERNATIONAL SALT COMPANY,**
**Appellant,**

v.

**COMMISSIONER OF PATENTS.**

**Nos. 22900, 22902.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 13, 1970.

Decided April 15, 1970.

Mr. Jack E. Armore, Atty., U. S. Patent Office, with whom Mr. S. William Cochran, Acting Solicitor, U. S. Patent Office, was on the brief, for appellant in No. 22,900 and appellee in No. 22,902. Mr. Joseph Schimmel, Atty., U. S. Patent Office, at the time the record was filed, also entered an appearance for appellant in No. 22,900.

Mr. Edward B. Beale, Washington, D. C., for appellee in No. 22,900 and appellant in No. 22,902.

Before TAMM and ROBB, Circuit Judges, and JAMESON,* Senior District Judge.

TAMM, Circuit Judge:

This case arises on cross-appeals from a decision of the district court determining the patentability of a process for producing pure salt brine. The trial court rejected the Patent Office's conclusion that all of the company's seven pending claims were unpatentable; instead, it held that the company was entitled to patents on two of the claims. A third claim was dismissed "without prejudice," all other claims having been withdrawn from suit. For the reasons hereinafter stated, we hold that the district court's determinations of patentability were erroneous as a matter of law and must be reversed.

### I. THE CLAIMED INVENTION

As is often true in patent cases, proper disposition of the pending controversy

---

* Sitting by designation pursuant to the provisions of Title 28, U.S.Code, Section 291(d),

requires both a detailed description of the disputed patent's subject matter and a survey of the technical developments leading to the claimed invention. The product in question, salt, has been used and produced by mankind since prehistoric times, primarily for seasoning and preserving food;[1] in recent years, however, salt has found many new industrial uses, notably in the synthetic chemistry underlying a surprising variety of commercial products. (I J.A. 50; II J.A. 264–65.) In these latter uses salt must be reduced to its constituent elements through electrolytic processes, and for these purposes very pure salt brine is needed. Since brine is merely a mixture of salt and water or some other solvent, the basic problem for industrial users is finding an efficient means of removing the impurities which are found in salt as it exists in its natural state.

The great bulk of industrial salt is mined from subterranean beds of rock which were deposited when primeval seas retreated from the present land masses.[2] This rock salt contains various impurities in different proportions, but one of the most common and troublesome contaminants is anhydrous calcium sulfate, commonly referred to in the trade as "anhydrite." In comparison to salt, calcium sulfate is relatively insoluble in water; it is, however, more easily soluble in dilute brine solutions. Kaufmann, the developer of the process currently in issue, sought to capitalize upon these differences in solubility as a basis for separating the anhydrite from the brine. In simple terms, his process employed three chief components: a dissolving chamber, a brine pump, and a centrifugal separator. The dissolving chamber, as depicted in the record, is simply a vertical tank into which the rock salt is fed. (II J.A. 340.) The solvent, water, is piped into the bottom of this tank at high speeds, at least in comparison to rates normally found in salt-dissolving chambers. The water proceeds rapidly upward through the bed of rock salt, dissolving the salt but not the less soluble anhydrite; the calcium sulfate, freed from the dissolving rock salt, is "entrained" or carried along largely undissolved in the flowing water. The rapid movement of the water is maintained by a pump attached to a pipe which exists from the top of the dissolving tank. The water (which by this stage of its journey has become brine) is drawn off at that point and fed into a "hydrocyclone" or centrifugal separator, which is designed to achieve rapid removal of the anhydrite before it has an opportunity to dissolve. The separator is simply a cone-shaped tank, with the point of the cone facing downward. The outflow from the dissolving chamber is pumped into the top or wide end of the cone, at high speed and tangentially to

1. It is interesting to note that the salt industry has played a rather prominent role in the evolution of our present patent system. For example, the monopoly in salt-trading granted by Queen Elizabeth was one of the abuses which eventually led Parliament to pass the Statute of Monopolies in 1623. 1 Deller's Walker on Patents 8–13 (2d ed. 1964). *See also* D. Kaufmann, Sodium Chloride: The Production and Properties of Salt and Brine 9 (1968) [hereinafter "Kaufmann"—the same Kaufmann who developed the process presently in dispute] : "The first patent issued in America was for a process of making salt. It was issued in 1641 by the Colony of the Massachusetts Bay in New England, and was granted to Samuel Winslow by the General Court of Elections in Boston."

2. Apparently geologists are in some dispute as to the precise methods by which beds of rock salt were formed; *see* Kaufmann at 41–66. At 51–52, the author summarizes the major theories as follows:

All theories of salt deposition that are acceptable today involve the precipitation of sodium chloride from an evaporating body of water as the concluding phase. * * * The theories of the origin of bedded salt deposits fall into one of two primary types: terrestrial and marine. The terrestrial type originates with meteoric (rain) rather than ocean water. The breakdown within the terrestrial type depends upon the source of the salt; the marine type is subclassified first as to absence or presence of later enrichment in sodium chloride and then by the manner of that enrichment.

the side of the cone. This imparts sufficient rotational motion to the fluid to create a "whirlpool" effect; the undissolved anhydrites and other solid impurities are thus forced outward against the sides of the cone, and then down the sides and through a waste outlet consisting of a pipe exiting from the point of the cone. The purified brine is contemporaneously piped off from the top center of the separator.

## II. PROCEDURAL HISTORY OF THE CASE

Appellant International Salt Company (hereinafter "plaintiff" or "the company") is assignee of Patent Application No. 261,929, filed by Kaufmann on February 11, 1963. This application consisted of a number of separate claims describing the foregoing process, which was denominated the "Fractional Dissolution Method." After extended proceedings before the Patent Office, which we need not discuss in any detail, the Board of Appeals ruled that the process described above was not patentable because it would be obvious to one skilled in the art, and would produce a result which "constitutes only a difference of degree and not a difference in kind such as would give rise to patentable invention." (II J.A. 366–67.) The company then brought an action against the Commissioner of Patents in the district court pursuant to 35 U.S.C. § 145 (1964), seeking a judgment authorizing the issuance of patents on claims 2 through 8 of the application. When the case came on for trial, plaintiff withdrew four claims from suit, leaving in issue only claims 4, 5, and 8. (I J.A. 14–15.) At the conclusion of the trial, the court ruled that plaintiff was not entitled to a patent on any of these three claims. (I J.A. 94.)

Plaintiff thereupon retained new counsel, filed notice of appeal (I J.A. 96), and then filed a motion in the district court seeking to have the judgment vacated and a new or reopened trial granted. On June 6, 1968, the district court ordered the trial reopened pursuant to Rule 60(b) (6) of the Federal Rules of Civil Procedure "to permit plaintiff to present additional evidence" and "to permit plaintiff to modify the withdrawal of claims 2, 3, 6 and 7." (I J.A. 97.) Thereafter this court remanded the pending appeal, and a second trial was held in November of 1968 on claims 4, 5, and 6. On January 8, 1969, the district court entered a second judgment authorizing the issuance of a patent on claims 5 and 6 but dismissing the complaint as to claim 4 "without prejudice." [3] The Commissioner of Patents took the present appeal, contending that the district court erred as a matter of law in holding the two claims patentable, and dismissing the other claim without prejudice; the plaintiff cross-appealed, asserting that the district court erred in dismissing its complaint as to claim 4.

## III. PATENTABILITY OF THE CLAIMED INVENTION

Most of the substantial questions presented by this appeal center around the standard of "obviousness" codified in 35 U.S.C. § 103 (1964), which provides that a patent may not be obtained "if the differences between the subject matter

---

3. This rather unusual disposition is explained by the following language in the company's brief:

> Past experience, in other cases, had led plaintiff's attorney to believe that differences of opinion held by the Patent Office and his client might be settled * * * by post-litigation negotiations and compromise. * * * Anticipating the possibility of such negotiations in the instant case, plaintiff requested, as a secondary, alternative, relief, that claim 4 be dismissed "without prejudice" if at all. The trial transcript reveals

> plaintiff's fear of Patent Office application of "res judicata".

(Brief for International Salt Co. at 38.) We think that the Commissioner's objections to this procedure are well founded: negotiation undoubtedly plays a valid role in administration of the patent system, but once a claim has been subjected to a lengthy and complex trial on the merits it is grossly inefficient and wasteful to leave the controversy in such a posture that the Patent Office and the courts can be forced to travel the same long and burdensome road again.

sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." The broad outlines of our approach in determining questions of obviousness were sketched in Higley v. Brenner, 128 U.S.App.D.C. 290, 292, 387 F.2d 855, 857 (1967): "What the prior art is and what the claimed invention is are questions of fact. However, whether the standard of obviousness applied to those facts is correct, is a question of law."

In the instant case there is no doubt that the individual components of the claimed invention were well known in the prior art; as the district court found, "[w]e have here a situation that occurs on occasion when an inventor takes known elements, the significance of which had not been fully appreciated, puts them together and harnesses them to do something that had not been done the same way before." (I J.A. 217.) The Supreme Court has counseled judicial caution in evaluating such patent claims:

> Courts should scrutinize combination patent claims with a care proportional to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions * * * obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men.

Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 152–153, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950).

With this general philosophy in mind, we turn to the claims presently in issue. In general, the distinctions among the three claims may be summarized as follows: claim 4 describes an upward flow of solvent in the dissolving chamber, but does not specify any flow rate; on the other hand, claims 5 and 6 do not require any particular direction of solvent flow, but do require a flow rate of at least ten gallons per minute per square foot of cross-sectional area of flow path. Finally, claim 4 does not specify how the final separation of anhydrite from brine is to be effected, but claims 5 and 6 require centrifugal separation. According to the trial court's findings and the company's brief in this court, the common nexus among all of these claims, and the nugget of patentable invention if any is to be found here, resides primarily in the speed with which the entire process is accomplished. (I App. 216–18; Brief for International Salt Co. at 24.) For present purposes we shall not consider the claims separately, but rather shall aggregate them in the manner most favorable to the plaintiff; thus, the following discussion will proceed upon the assumption that the claimed process involves an upflow dissolver, operating at the specified rapid flow rate, followed by centrifugal separation.

The principal references [4] to prior art relied upon by the Patent Office and the trial court are two patents which, for convenience will be referred to as "Courthope" [5] and "Laughlin." [6] The Courthope patent involves a dissolving apparatus designed to remove anhydrite and other impurities from brine. In general,

---

4. There is also a dispute between the parties as to whether a third patent for a brine-making device [the "Miller patent") antedates the present claim. Resolution of this question essentially turns upon whther the operative date of the Miller reference is the date on which the

patent itself was issued, or the date of an earlier abandoned application. In view of our disposition of this appeal, we intimate no opinion as to the merits of this issue.

5. Patent No. 2,734,804 (Feb. 14, 1956).

6. Patent No. 2,364,799 (Dec. 12, 1944).

it is built around an upflow dissolver which has the solvent "pulsating" rather than flowing uniformly through the bed of salt; the pulsating action causes anhydrite particles to settle into a chamber underneath the bed of rock salt. The brine is piped out of the top of the dissolving chamber into a settling tank and then overflows into a filter chamber, which further removes solid impurities from the brine. Thus, although the movement is slower and the results are accomplished differently, the basic underlying concept in Courthope, as in the present claim, is a two-step process of dissolving and separation. More pertinent to the present case, however, is the following language in the Courthope patent:

> The rate of leaching [dissolving] of the calcium sulfate in the dissolution water or brine is of course a function of the length of time of contact and of the speed of dissolution liquid flow, as well as the degree of concentration of the sulfate particles in the salt bed. Further, it is generally known that * * * calcium sulfate * * * is more soluble in brine than in water but is most soluble in brine ranging * * * between 50% and 80% saturation. *Therefore, it follows that in order to produce a purer brine without substantial sulfate content, it is necessary to remove the feed-in sulfate particles from contact with the dissolution liquid as quickly as possible when the latter is within the range of 50% to 80% saturation condition.*

(J.A. 251; emphasis added.) This is little more than a restatement of general scientific principles governing the physical properties of salt and calcium sulfate; as the company admits in its brief, "[t]he solubility characteristics of salt have long been so well known, and so thoroughly explored, that they have been put in 'tables', have been covered in 'dilution rules', * * * and may be 'readily found'." (Brief for International Salt Co. at 11.)

The second major component taken from the prior art is the "hydro-cyclone" or centrifugal separator described above, which is the subject matter of the Laughlin patent. Its usefulness in salt-making is described in the second paragraph of that patent:

> In the purification of salts such as sodium chloride it is usually necessary to use large volumes of water which must be removed in order to recover the purified salt. Ordinarily this may be accomplished by evaporating solutions of the salt to obtain a dilute slurry, concentrating to a heavy slurry by means of large settling equipment, filtering to remove solid salt. * * *
>
> * * * [One] object [of the patented separator] is to provide a means for the *concentration of slurries* which is simple, efficient, and suitable for rapid and continuous operation.

(II App. 246.) Further statements in the Laughlin patent indicate that the device is useful for different kinds of separation, depending upon the speed with which it is operated. Thus, it is said that "[t]he rate at which the slurry is fed may be regulated so as to obtain the desired degree of separation," and that "[t]he degree of concentration may be controlled by regulating the rate of concentrate removal." With suitable regulation," the patent points out, "our invention may also be effectively used as a classifier." (*Id.* at 246–247.)

The "differences between the prior art and the claims at issue,"[7] then, reside in the selection of those familiar components which permit maximum speed at each stage of the operation. That fast flow rates at the dissolving stage would

7. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966):
   Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

cause the anhydrite to be "entrained" or carried along in the solvent was not merely obvious, but a simple matter of scientific fact; that the brine would become more contaminated the longer the anhydrite remained in it was also knowledge which was in the public domain; finally, that centrifugal separation was a practical means of rapidly removing solids from liquids was also known to the art.[8] In light of these teachings, we do not think that the plaintiff's claimed invention evidences the "synergistic result" or "effect greater than the sum of the several effects taken separately" which is required for patentability. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969) *see also* Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950). At the same time, we cannot conclude that the "secondary considerations" bearing on the ultimate legal question of obviousness which are enumerated in Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), point toward an opposite conclusion. There the Court stated that subsidiary factors such as "commercial success, long felt but unresolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." In the instant case the district court made no findings on these issues in either of its two opinions (I J.A. 89–94, 214–19), and the evidence contained in the record on appeal is at best equivocal. The company's brief admits that there is "limited actual public acceptance" of the process in question, while marshalling a formidable array of descriptive adjectives to extol its economic potential. (Brief for International Salt Co. at 28–29.) We think that the record evidence cited in support of these optimistic claims is insufficient to support an inference of patentability. Similarly, the company's discussion of shortcomings in prior processes and apparatus,[9] some of which are nearly a century old, fails to indicate which of the described inventions were designed to produce high-purity brine for industrial uses, or to set forth with particularity the length or intensity of the salt industry's efforts to solve the problems which Kaufmann's process allegedly alleviates. *Cf.* American Steel & Wire Co. of New Jersey v. Coe, 70 App.D.C. 138, 140–141, 105 F.2d 17, 19 (1939).

Since we have concluded that the claimed invention, even when viewed in the light most favorable to the company, must be deemed obvious as a matter of law, it follows that the individual claims must fail. Accordingly, we hold that the district court erred by concluding that the company was entitled to a patent on claims 5 and 6, and dismissing claim 4 without prejudice. Its judgment must therefore be reversed.

Reversed.

---

8. At trial, the plaintiff's expert witness and employee testified as follows on cross-examination (I App. 72–73):

Q Would it be obvious working in this field, in order to speed up the production of the sodium chloride brine, to speed up the rate of flow of a solvent * * *?

\* \* \* \* \*

A Yes, this would be obvious, with limitations.

Q Would it be also obvious that in speeding up the flow of brine, that the particles of calcium sulfate * * * would be entrained or caught up in the flow of brine?

A Yes.

\* \* \* \* \*

Q * * * [I]s it known in the art that there are separators which will accomplish a quick separation of suspended solid matter in solution?

A Yes.

Q Is the centrifugal separator known in the art, in the prior art?

A Yes.

9. Brief for International Salt Co. at 12–13, 22–23.